Darlene Oliver
10219 Kings River Court
Fountain Valley, CA 92708
714-620-5881

*Representing Self*

**FEE PAID**

FILED
CLERK, U.S. DISTRICT COURT
10/10/2025
CENTRAL DISTRICT OF CALIFORNIA
BY ___EC___ DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARLENE OLIVER, an individual, | 8:25-cv-02314-VBF-DTB |
| Plaintiff, | Case No.: TBD |
| v. | **COMPLAINT** |
| SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT, SADDLEBACK VALLEY UNIFIED SCHOOL DISTRICT BOARD OF EDUCATION, in their official and individual capacities, LOS ALISOS INTERMEDIATE SCHOOL STAFF MEMBERS, in their official and individual capacities, LOS ALISOS INTERMEDIATE SCHOOL TEACHER #1, in his official and individual capacities. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## COMPLAINT

I, Darlene Oliver ("Plaintiff"), file this Complaint for declaratory relief and damages against Defendants the Saddleback Valley Unified School District, the Saddleback Unified School District Board, the Los Alisos Intermediate School staff members, and Los Alisos Intermediate School Teacher #1 (collectively, "Defendants").

## INTRODUCTION

Defendants violated my constitutional rights. First, under the U.S. Constitution's Free Exercise Clause, because my religious beliefs prohibit me from

1

COMPLAINT

allowing my daughter to undress with biological males. And Defendants hid their policy from me that authorized such conduct, delaying for months before informing me that my daughter could opt out when she was initially informed she had no other option. Second, under the Fourteenth Amendment's Due Process Clause by withholding information so I could make informed judgment about rearing my child and thus interfering with my parental rights. Third, under the First Amendment's Free Speech Clause, by physically blocking me from legally distributing flyers to inform other parents at the school about the policy, calling the police on me repeatedly, and posting a picture of me on social media engaging in that behavior, criticizing me and asking the public to out me.

Additionally Defendants behavior caused my daughter significant emotional distress, forced me to withdraw my daughter from school and incur expenses to home school her, exacerbated existing disabilities and health problems, and caused me new health maladies, which I suffer from to this day. I seek a jury trial to find that Defendants violated my rights and injured me, as well as compensation.

## JURISDICTION AND VENUE

1. This case presents federal questions arising under the Constitution of the United States and seeks relief for the deprivation of federal rights under color of state law. This Court accordingly has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

2. This Court has authority to award Plaintiff declaratory relief pursuant to 28 U.S.C. § 2201, and damages under 42 U.S.C. §§ 1983 and 1988.

3. Venue is proper in this District under both 28 U.S.C. § 1391(b)(1) & (2) because at least one of residents resides in the districts and all of the defendants are residents of California, and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

4. I am Darlene Oliver, the Plaintiff. My daughter is a former student at Los Alisos Intermediate School in the Saddleback Valley Unified School District.

5. Saddleback Valley Unified School District is one of the defendants and has oversight for the school my daughter attended.

6. Saddleback Valley Unified School District Board of Education is one of the defendants and has oversight of the School District.

7. Los Alisos Intermediate School is in the District and is where my daughter attended school when the events subject to this complaint took place. The staff at the School are defendants and engaged in various behaviors that violated my constitutional rights.

8. Teacher #1 is a defendant, worked at the Los Alisos Intermediate School and directly interacted with me, infringing my constitutional rights.

## FACTUAL ALLEGATIONS

9. I, Plaintiff, am a Christian and religious believe that girls and boys should not undress in front of each other or see each other undressing.

10. At the beginning of the 2022-2023 school year, my daughter, then 13 years old and shy, started at Los Alisos Intermediate School as a seventh grader.

11. When enrolling my daughter, I made sure to ask the staff assisting me about the school's policies. I specifically requested that she be exempt from the sex education, among other things.

12. At no point was I informed that the district was also enforcing bathroom and locker room policies allowing students to use facilities based on gender identity rather than biological sex.

13. I left that conversation believing I was one of the lucky parents — that this school wasn't implementing those controversial policies.

14. During school orientation, my daughter was told she must change for PE in the locker room. It was required and would affect her grade. She was also told

she could not use the bathroom stalls to change, as those were reserved for students who needed to go to the bathroom and using them would interrupt the flow of locker room procedures. My daughter was told of no alternative options for privacy at that time.

15. Because of this, my daughter believed she had no choice but to change her clothes in the open, in front of everyone.

16. In May 2023, near the end of the school year, my daughter came home from school saying a boy had been in the locker room changing clothes with her. She had felt deeply uneasy that a biological male who was transitioning was present with her in the locker room. She had been in the middle of undress and looked up to unexpectedly see the boy.

17. I was disturbed that this would occur and that I would not be informed. The very next morning I went to the school office to ask whether biological males were being allowed to change in the girls' locker room. I simply wanted to protect her and my rights; and also knowing this I could ensure they offered her other options.

18. I expected that if it were not a policy, the staff would look into it, as ayone would have. And I thought if it was a policy, they would tell me so in the office when I asked.

19. The staff acted surprised that something like this had happened, asked for details, and said they would look into it. One staff member even asked for the PE teacher's name so they could "check into it," as if it were an isolated incident. A few days passed, and no one followed up with me. No one ever got back to me

20. I ended up buying her bathing suit attire for her to wear under her clothes to give her some privacy.

21. When the school staff never got back to me, during that ensuing week, my daughter wondered if she had been mistaken and said she was embarrassed and did not want me to pursue it.

22. I thought surely if there was such a policy and the school was enforcing it the staff would have told me. Surely, they would not pretend it was not true. So, for the moment, because the school did not get back to me, I assumed no such policy existed and I let it go, having her continue to wear the swimsuit under her clothes just in case to finish out the end of the school year.

23. However, in August 2023, at the start of the following school year (2023-2024), while reviewing school policies, I discovered in writing that the school *was* in fact enforcing a policy allowing students to use the restroom and locker room that aligns with their gender identity — meaning biological males were allowed to access the girls' locker room if they identified as female. This contradicted the way the school responded to me previously and confirmed my daughter was likely correct in what she had seen and experienced.

24. Additionally, the policy states that transitioning or trans gender students may use gender-neutral restrooms or changing areas, but these options were not offered to non-transitioning students.

25. Alarmed at what I had learned, I returned to the school office to ask about the policy and share my concerns. This time, the staff's entire demeanor changed. They firmly refused to answer any of my questions, would not even discuss the matter at all, and instead told me I would need to take my concerns to the school board.

26. The staff had initially lied about the policy, saying they didn't know or would "look into it," when it was clearly already in place: It was a district-wide policy, and they already knew that. That deceit left me feeling betrayed, and worse — it made my young teenage daughter question her own perception and feel embarrassed, unsupported, and vulnerable.

27. After learning the truth, I began informing other parents. I went to the school during drop-off times at least four times and passed out flyers with the district's policy to raise awareness. I was not on school property but the sidewalk.

Many parents were unaware and thanked me for the information. A few became hostile. One parent, who I later learned had a transgender child, accused me of attacking her child. I explained I was simply distributing factual information from the school policy so people could make informed decisions. She continued yelling, so I moved away to avoid conflict.

28. When I was passing out flyers that re-printed the district's policy, school staff called the police on me each of the three times, even though each time the police determined I was doing nothing wrong, told me so, and let me continue, telling me to just stay on the sidewalk and I'd be just fine. They stayed nearby to watch and keep the peace.

29. On two of those occasions, when the police refused to stop me, the school then sent out a very large male teacher, Defendant Teacher #1. He came out to the curb, and put his arms out to coax me back, and then took my place standing right in front of me. He started waving everyone by telling them to keep it moving. I kept dodging right or left to give them out while avoiding crossing onto the school driveway or property. Even when people wanted them, he would tell them to go on and block me dodging in front each time.

30. At one point, a woman turned right and pulled over to the curb asking me to bring it to her on the sidewalk. I did. She thanked me for being out there. I went back to trying to give out the rest of the flyers before school started and he kept blocking me.

31. He said he was doing this for safety, but the police nearby did not seem to feel concerned about what was going on. And he was making it unsafe for some drivers who wanted my flyers.

32. I became aware later of a social media picture post of me passing out the flyers outside of the school made by a teacher at El Toro High School, a school within the District. The teacher took a photo of me without my consent and publicly shared it online also without consent, criticizing my actions in derogatory language

and asking others if they knew who I was. I felt personally targeted and attacked by this post. The teacher made another social media post directed at me, saying, "Take your hate somewhere else."

33. This was never about attacking anyone's identity. It was about protecting my child and my rights, ensuring that parents are fully informed, and holding a public institution accountable for its actions. The school's behavior — from hiding the policy to actively trying to silence me — made me feel isolated and powerless.

34. I also attended and tried to speak at school board meetings regarding the policy. But when the school got wind because my flyers encouraged parent to attend, the meetings were packed with teachers who sat together en masse, wearing matching t-shirts, took up the speaking slots, and booed parents when they spoke. I was able to speak once about this policy, and the teachers in attendance booed me when I did.

35. After school staff refused to speak to me about the policy and directed me to the school board, on September 15, 2023, I wrote a formal letter via email to the school board, raising various questions.

36. I ended that letter with these words: "I look forward to a productive conversation that will ultimately serve the best interests of our children and the community to move us forward, and not move us all further apart. Let's work to heal the community and protect our children."

37. On October 10, 2023, I received an email response Justin Stanfield, the Director of Student Services at Saddleback Valley Unified School District.

38. The letter informed me that those uncomfortable with the policy of allowing students to use the locker room of their choice could use private, single-use restrooms or the school's health office.

39. This was the first time anyone had informed me of such an option. Nor was this option written into the policy that I had found online.

40. Later that month I withdrew my daughter from the school to home school her after my trust had been violated by Defendants, and we moved to get out of the school district as I was unsure how long I would be able to home school her. I spent about $700 on home school supplies.

41. Additionally, I am disabled. I have eight bulging discs in back and neck, carpal tunnel syndrome in both hands, neuropathy all four limbs, liver disease, and diabetes. Further, stress causes me pain. This ongoing incident with Defendants was extremely stressful and has caused me pain.

42. Defendants' treatment of me also hurt my health besides aggravating existing conditions. Because of it I developed and was diagnosed with sleep apnea. I struggle to get five hours of sleep a night. I also developed high blood pressure from Defendants' actions. My health has been in decline since this all took place. I have to get massages every two to three weeks because of pain all over that I experience, made worse by Defendants.

## COUNT I:
## First Amendment Free Exercise Clause: Religious Upbring of Children
## U.S. Const. Amend. I, Cl. 2; 42 U.S.C. § 1983

43. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

44. The U.S. Constittion's First Amendment's Free Exercise Clause states that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const. amend. I. And "[t]hat restriction applies equally to the States by way of the Fourteenth Amendment." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2350 (2025) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)).

45. Furthermore, "the right to free exercise, like other First Amendment rights, is not 'shed . . . at the schoolhouse gate.'" *Id.* (quoting *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 506–507 (1969)). Thus,

"[g]overnment schools, like all government institutions, may not place unconstitutional burdens on religious exercise." *Id*.

46. "A government burdens the religious exercise of parents when it requires them to submit their children to [anything] that poses 'a very real threat of undermining' the religious beliefs and practices that the parents wish to instill." *Id*. at 2342 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). "And a government cannot condition the benefit of free public education on parents' acceptance of such[.]" *Id*.

47. The Supreme Court found such unconstitutional interference in *Mahmoud*, where school children were exposed to children's books on LGBT themes. *Id*. at 2350-51, 2353, 2360.

48. That unconstitutional burden is even stronger here. More so than my daughter being read a book with content I object to, my daughter was exposed to and forced to expose herself to someone of the opposite sex, something contrary to what I have taught her about proper conduct given our religious beliefs. The Defendants' policy further instructs my daughter that such conduct is acceptable. This egregiously interferes with my ability to raise my daughter according to our faith.

49. Having substantially burdened my religious free exercise in the educational context, Defendants must satisfy strict scrutiny. *See id*. at 2361 ("When the burden imposed is of the same character as that imposed in Yoder, we need not ask whether the law at issue is neutral or generally applicable before proceeding to strict scrutiny."). Thus, "[t]o survive strict scrutiny, a government must demonstrate that its policy 'advances interests of the highest order' and is narrowly tailored to achieve those interests." *Id.* at 2361 (quoting *Fulton v. Philadelphia*, 593 U.S. 522, 541 (2021)).

50. The board cannot show that is had a compelling interest in refusing to inform or provide an opt-out to my daughter because it already provided opt-outs for

1 transgender children in its policy—they could change in a private place if they
2 desired, but daughter could not. *See id.* at 2362.

3     51.    Furthermore, by informing the parents of transgender children and
4 letting their children opt-out, but not doing the same for me given my religious
5 motivations, Defendants also treated religious less favorably than secular concerns,
6 violating the Free Exercise Clause. *See generally Tandon v. Newsom*, 593 U.S. 61
7 (2021).

8     52.    Thus, Defendants violated my constitutional rights under the First
9 Amendment's Free Exercise Clause.

**SECOND CLAIM FOR RELIEF:**

**First Amendment's Free Speech Clause**

**U.S. Const. Amend. I, Cl. 3; 42 U.S.C. § 1983**

13     53.    Plaintiffs hereby incorporate the allegations made in each preceding
14 paragraph of this Complaint as if fully set forth herein.

15     54.    The Free Speech Clause of the First Amendment to the United States
16 Constitution mandates that no instrumentality of any government in the United
17 States shall "abridging the freedom of speech." U.S. Const. amend. I, cl. 3. That right
18 applies to the States through the Fourteenth Amendment. *Prete v. Bradbury*, 438
19 F.3d 949, 961 (9th Cir. 2006).

20     55.    Yet another reason for First Amendment protections is "because the
21 freedom of thought and speech is indispensable to the discovery and spread of
22 political truth. By allowing all views to flourish, the framers understood, we may
23 test and improve our own thinking both as individuals and as a Nation." *303 Creative*
24 *LLC v. Elenis*, 600 U.S. 570, 584 (2023) (internal quotation marks omitted). Forcing
25 minors to undress with members of the opposite sex at school is one of the most
26 controversial political, social, and medical issues in American life, meriting the apex
27 of First Amendment protection.

56. And peacefully passing out flyers in public that reprints a school's policy is protected by the Free Speech Clause. *See DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, 485 U.S. 568, 575-576 (1988).

57. By blocking me from passing out the flyers, Defendants violated my free speech rights.

## THIRD CLAIM FOR RELIEF:

### 14th Amendment Due Process Clause—Parental Right to Information

### U.S. Const. Amend. XIV, § 1, Cl. 3; 42 U.S.C. § 1983

58. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

59. Parents cannot exercise their fundamental constitutional right to make decisions regarding their children's care when the government deliberately withholds critical educational religious information from them.

60. Defendants' conduct undermined these fundamental parental interests.

61. Parents' right to information is at its apex when it concerns the physical and mental wellbeing of their children.

62. Informing parents is "particularly desirable" regarding "profound moral and religious concerns." *Belloti v. Baird,* 443 U.S. 622, 640 (1979) (plurality). But parents cannot provide "mature advice and emotional support" if they are kept in the dark. *Id*.

63. In particular, parents are injured when schools withhold information parents need to make informed decisions about their child's mental, emotional, religious, or physical safety.

64. Parents cannot participate in the companionship, care, custody, and management of their children regarding medical, religious, mental, emotional, and moral concerns when the state withholds information fundamental to that endeavor.

65. Defendants withheld from me the policy about biological males being able to use the School's locker room alongside my daughter, a biological female.

1 Defendants also withheld information regarding my daughter's ability to opt-out of this intimate co-ed situation. I could therefore not make decisions and take action regarding the care and upbringing of my child, nor protect her from exposing herself and being exposed to a biological male.

66. Thus, Defendants violated my procedural due process rights under the Fourteenth Amendment.

## FOURTH CLAIM FOR RELIEF:
## 14TH Amendment Due Process Clause—Parental Right to Direct Children's Education and Upbringing
## U.S. Const. Amend. XIV, § 1, Cl. 3; 42 U.S.C. § 1983

67. Plaintiffs hereby incorporate the allegations made in each preceding paragraph of this Complaint as if fully set forth herein.

68. "[T]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)).

69. That "right" and "high duty" is not only deeply embedded in "[t]he history and culture of Western civilization," *Yoder*, 406 U.S. at 232; it also has "a constitutional dimension," *Troxel*, 530 U.S. at 65.

70. For a century now, Supreme Court decisions have eestablishd that "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Id*. at 66.

71. In other words, the "'liberty' specially protected by the Due Process Clause includes the right[] … to direct the education and upbringing of one's children." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

72. Thus, Defendants may not violate the "cardinal" principle "that the custody, care and nurture of the child reside first in the parents, whose primary

function and freedom include preparation for obligations the state can neither supply nor hinder." *Troxel*, 268 U.S. at 65-66 (emphases added) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

73. Defendants violated my fundamental parental right to make key decisions regarding the upbringing, education, custody, care, and control of their children, including the right to opt my daughter out of an educational situation that violates my religious beliefs and practices.

74. And as shown above, there is no compelling state interest in refusing to inform me of the policy and the opt-out when other parents were so informed.

75. Hence, Defendants ignored what "[p]ublic schools must not forget": "that 'in loco parentis' does not mean 'displace parents.'" *Gruenke v. Seip*, 225 F.3d 290, 307 (3d Cir. 2000).

76. Defendants have thus violated my constitutional rights under the Fourteenth Amendment, and I have suffered monetary damages and emotional and physical suffering because of Defendants' disregard for my rights. I am therefore entitled to relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1. A trial by jury;

2. Enter a declaration that Defendants' refusal to inform and afford Plaintiff a right to opt out Plaintiff's daughter having to undress with one or more biological males in the school locker room violates the Free Exercise Clause of the First Amendment of the United States Constitution;

3. Enter a declaration that Defendants' blocking Plaintiff from legally passing out flyers and posting information about her online while she did so violates the Free Speech Clause of the First Amendment of the United States Constitution;

4. Enter a declaration that Defendants' refusal to inform and afford Plaintiff a right to opt out her daughter from having to undress with one or more

biological males in the school locker room violates Plaintiff's parental rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution;

    5.    Award nominal damages to Plaintiff;

    6.    Award actual damages incurred by Plaintiff in being forced to pursue other educational opportunities for her child because of Defendants' disregard of her constitutional rights and increased medical costs;

    7.    Award damages to Plaintiff for pain and suffering;

    8.    Award punitive damages to Plaintiff for Defendants' egregious conduct;

    9.    Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable laws; and

    10.    Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*/s/ Darlene Oliver*

*Plaintiff*

10219 Kings River Court
Fountain Valley, CA 92708
714-620-5881
darlenekoliver@hotmail.com

Dated: October 10, 2025